AO 1



# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

2/9/2023

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   3:23-mj-51
)
4074 MIDDLEHURST LANE, DAYTON, OH 45406 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843, & 846; 18 U.S.C.§§ 1956, 1343, 1344, 1014, 645(a), and 1040 | Possession with intent to distribute controlled substance and conspiracy; use of communication facility to commit drug offense; money laundering; wire fraud; bank fraud; false statement in loan application; false statement to SBA; fraud |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DAVID ASHLEY
_____
*Applicant's signature*

Digitally signed by DAVID ASHLEY
Date: 2023.02.08 22:26:37 -05'00'

David Ashley, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 2/9/23 _____

City and state: _____ Dayton, Ohio _____

Peter B. Silvain, Jr.
United States Magistrate Judge
_____
*Judge*

## ATTACHMENT A

*Property to be searched*

The property to be searched is **4074 Middlehurst Lane, Dayton, Ohio 45406,** pictured below, and further described as a single-story single-family residence with colored siding. The front door has a screen door with a porch light to the left of this door and a mailbox attached to the house on the right of the door. When viewing the front of the house, there is a recessed pedestrian door to the left which also has a screen door, and two windows to the right of the front door. The property to be searched includes any vehicles on the curtilage of 4074 Middlehurst Lane, Dayton, Ohio 45406, including, but not limited to, a maroon Astro van (pictured below in the driveway).



## ATTACHMENT B

*Property to be seized*

1. All records and items relating to violations of 21 U.S.C. §§ 841(a) and 846 (possession with intent to distribute a controlled substance and conspiracy to do so); 21 U.S.C. § 843 (use of a communication facility to commit a felony drug offense); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); 18 U.S.C. § 1014 (False Statement in Loan and Credit Applications); 15 U.S.C. § 645(a) (False Representations to the Small Business Administration); and/or 18 U.S.C. § 1040 (Fraud in Connection with Emergency), those violations involving Clay ALLEN, Dazzling HARRIS, and/or other unknown subjects, and occurring on or after January 1, 2019, through June 30, 2022:

  a. Any cell phone, computer, tablet, and/or other electronic device capable of accessing the internet, communicating with other electronic devices, and/or storing electronic information;

  b. The sale, possession, and/or distribution of methamphetamine, fentanyl, and/or other controlled substances;

  c. Drug proceeds and the location and/or use or transfer of such proceeds;

  d. Communications between Dazzling Harris, Clay Allen, and/or other co-conspirators;

e.   List of customers and related identifying information;

f.   Types, amounts, and prices of drugs trafficked as well as dates, places, and
amounts of specific transactions;

g.   Any information related to sources of drugs (including names, addresses, phone
numbers, or any other identifying information);

h.   Firearms and/or ammunition;

i.   Any shipping supplies, including, but not limited to, cardboard boxes, shipping
labels, packaging materials, and/or postage labels;

j.   All bank records, checks, credit card bills, account information, and other
financial records;

k.   Any records and information pertaining to the means and source of payment for
services and items (including any credit card or bank account number or digital
money transfer account information);

l.   Any records and information pertaining to travel, including but not limited to
records of lodging (such as hotels), air travel, vehicle rentals, and expenses
incurred during the time of travel;

m.   Any records and information pertaining to loan applications, including but not
limited to pandemic-related loans;

2

    n.   Any records and information pertaining to unemployment assistance applications, including but not limited to pandemic-related unemployment assistance;

    o.   Any records and information pertaining to income and/or employment;

    p.   Any records and information pertaining to the operation of a business, including, but not limited to, business letterhead, business files, business cards, payroll, lists of employees, employee/personnel files, facsimile machines, copiers, business computers, and/or tax documents; and

    q.   Records and information relating to the identity or location of coconspirators.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

3

of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      k.   records of or information about Internet Protocol addresses used by the COMPUTER;

      l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      m.  contextual information necessary to understand the evidence described in this attachment.

3.      Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 4074 MIDDLEHURST LANE, DAYTON, OH 45406 | Case No. ___3:23-mj-51___ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, David Ashley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **4074 Middlehurst Lane, Dayton, Ohio 45406**, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2. I am an "Investigative or Law Enforcement Officer" of the United States Drug Enforcement Administration (DEA) within the meaning of Title 21, United States Code, Section 878, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878.

3. I am a law enforcement officer and have been employed by the DEA since 2009. I am currently assigned to the Dayton Resident Office. I have conducted and participated in complex drug trafficking conspiracy and money laundering investigations which have resulted in arrests;

execution of search warrants that resulted in the seizure of narcotics, narcotics proceeds and other evidence of narcotics trafficking activities; and supervised the activities of cooperating sources (CS) that have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived therefrom. Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source, and location of proceeds of illegal activity, commonly referred to as money laundering.

4.      I have experience analyzing electronic information, such as information contained in cell phones, email accounts, and iCloud accounts, for evidence relating to drug trafficking and money laundering. I am familiar with the manner in which people use email accounts—such as to book travel and maintain financial accounts—that facilitate their drug trafficking activities. As I describe in  more detail below, I am familiar with the common practices and methods of Drug Trafficking Organizations ("DTOs"), including the use of stash house locations to store drugs, drug paraphernalia, firearms, drug proceeds, and documents recording drug proceeds.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## PROBABLE CAUSE

### A. Overview of the Investigation into ALLEN and HARRIS's Drug Trafficking and Pandemic Fraud Schemes

6.      The DEA Dayton Resident Office is conducting an ongoing investigation into the criminal activities of Clay ALLEN[1] and Dazzling HARRIS.[2]

### i. The Drug Trafficking Scheme

7.      The DEA is investigating ALLEN and HARRIS's drug trafficking activities in relation to a United Parcel Services (UPS) package ("the package") containing methamphetamine and fentanyl.

8.      The evidence suggests that on November 29, 2021, ALLEN and HARRIS traveled by plane from Dayton, Ohio, to Los Angeles, California, in order to mail a package containing methamphetamine and fentanyl to Dayton, Ohio. On November 30, 2021, the day after ALLEN and HARRIS arrived in California, ALLEN sent the package via UPS to HARRIS's home address in Dayton. Early the next morning, on December 1, 2021, ALLEN and HARRIS left California and flew back Dayton.

_____

[1] ALLEN's criminal history includes convictions for disorderly conduct and possession of narcotics.

[2] HARRIS's criminal history includes convictions for aggravated robbery, theft, menacing, criminal damaging, OVI, and vandalism.

3

9. On December 2, 2021, while a UPS employee in Dayton was loading the package for delivery, s/he dropped the package and it split open, revealing drugs inside. UPS staff subsequently contacted law enforcement, who seized the package and ultimately confirmed that it contained illegal drugs.

10. As I describe in detail below, my investigation revealed a pattern of activity consistent with ALLEN and HARRIS repeatedly flying to California to ship drugs back to the Dayton, Ohio area, beginning at least as early as 2019 and lasting through 2022. These trips were booked using various email accounts and phone numbers.

### ii. The Pandemic Fraud Scheme

11. The DEA's investigation into ALLEN and HARRIS's drug trafficking activities yielded evidence related to pandemic assistance fraud. As I explain in more detail below, I learned that both ALLEN and HARRIS applied for, and received, thousands of dollars in federal aid related to the COVID-19 pandemic. For example, each separately received nearly the same amount—$18,000—on the same day—April 5, 2021—from the same financial institution— Capital Plus Financial—suggesting that ALLEN and HARRIS coordinated and assisted each other with their fraudulent pandemic assistance applications. Additionally, ALLEN and HARRIS separately applied for pandemic unemployment assistance in Ohio, Arizona, and California, among other locations. The evidence suggests that both ALLEN and HARRIS fraudulently

represented their income/employment information in order to obtain and attempt to obtain pandemic assistance funds, and coordinated their pandemic fraud efforts.

12.     Further, as I describe in more detail below, the evidence suggests that ALLEN used the money he received from his fraudulent pandemic aid loan application and unemployment application to fund his drug trafficking trips.

### iii.     Summary of Anticipated Evidence Located at the Premises

13.     I believe that the Premises contains additional evidence of ALLEN, HARRIS, and/or coconspirators' drug crimes, including records regarding travel and payments made to facilitate their drug trafficking activities; records and evidence showing the movement of drug proceeds; communications amongst coconspirators and sources of supply; electronic devices used in furtherance of drug trafficking; controlled substances and/or drug paraphernalia, including, but not limited to, firearms; and records of drug transactions. I also believe that the Premises contains additional evidence of ALLEN, HARRIS, and/or coconspirators' pandemic fraud crimes, including records regarding pandemic aid loans and unemployment fraudulently applied for; evidence that their businesses and/or income are inconsistent with what they claimed in their loan and unemployment applications; evidence that their employment/income was inconsistent with the amount of pandemic aid received; evidence of how the loan proceeds received were spent, transferred, or otherwise dissipated; records and communications about the pandemic loan scheme; electronic devices used in furtherance of fraudulently obtaining

5

pandemic assistance and unemployment funds; and a lack of indicia of legitimate business operations at the Premises.

**B. A package containing methamphetamine and fentanyl split open when it fell off a UPS truck, prompting UPS security personnel to contact law enforcement.**

14. On December 2, 2021, the United Parcel Services (UPS) security manager at a UPS distribution facility in West Carrollton, Ohio, reported to law enforcement authorities that a package being loaded onto a delivery truck fell off and split open when it hit the ground. After splitting open, UPS employees saw that the package appeared to contain illegal drugs. The package containing suspected drugs, which bore tracking number 1Z4F972W1255409659, had a label with the following information:

     a. Sender: ███████ 937-993-7000 The UPS Store #5892 2416 W. Victory Blvd, Burbank, CA 91506

     b. Recipient: Harris family ████████████████

     c. Brown box with UPS 3 Day select shipping. Tracking number 1Z4F972W1255409659. Weight 10 lbs. Shipped 30 Nov 2021. Box 13x13x13

15. That same day, law enforcement transported the UPS package containing the suspected drugs to the DEA Dayton Resident Office (DRO) for processing and follow-up investigation regarding the information on the shipping label. Investigators executed a Federal Administrative Subpoena for phone number 937-993-7000 (the "7000 Phone"), the phone number associated with the package's sender. The subpoena results identified the subscriber of the 7000 Phone as Dazzling HARRIS (HARRIS) at ████████████████, which is consistent with the package's recipient address. I conducted a Dayton Police Department records

search which showed that the 7000 Phone number was provided to law enforcement by a

Dazzling HARRIS residing at ██████████████████████, in relation to a theft she reported

on September 2, 2021.

16.     Upon inspection of the opened package, law enforcement located five (5) heat-

sealed bags each containing crystal rock-like material (approximately 2,374.9 grams total) that

field tests indicated was methamphetamine.  Investigators also located in the package a clear

taped owner's manual of a food saver (making an ad hoc envelope) which contained blue pills

marked "30" (approximately 146.1 grams total). Based on my training and experience, I know

that illegal drug traffickers manufacture fentanyl pills to resemble prescription painkillers, which

are in high demand. The blue pills, created to falsely resemble prescription painkillers, field-

tested positive for fentanyl. Also located in the box was one (1) heat-sealed bag with a green

leafy material of suspected marijuana (approximately 548.2 grams). These substances were sent

to the DEA North Central lab for testing. Official DEA laboratory results concluded that the

substances were in fact methamphetamine hydrochloride and fentanyl tablets. The suspected

marijuana was not tested.

### C. Agents learned that ALLEN, who in 2019 was associated with a different intercepted drug package, appeared to be associated with the December 2021 package's intended destination.

17.     On December 2, 2021, investigators conducted surveillance at the package's

intended destination: ████████████████████, which is the address linked to the 7000

Phone and HARRIS. Agents observed a red Chevrolet Astro Van with Ohio license plate

HZG1266 registered to a Clay ALLEN at , parked in front of the residence.

18.     I conducted a law enforcement search of ALLEN and his association with ███, and learned of a previously seized package. On August 6, 2019, the Dayton Police Department seized a package of approximately 2,710 grams of methamphetamine that had the following shipping information:



    a.   Sender: Clay ALLEN, phone number: ████████, address: ██████████.,

    b.   Recipient: ██████████████████████

19.     Miami Valley Regional Crime Lab test results on the August 6, 2019, package contents confirmed that it contained methamphetamine.

20.     Significantly, the two packages seized by law enforcement (the August 6, 2019, package and the December 2, 2021, UPS package) were both sent to an individual with the surname "HARRIS."

**D.  Phone, airline, and hotel records showed that ALLEN and HARRIS were in California when the package was sent from California to Dayton, Ohio.**

21.     Records from Delta Airlines show that on November 29, 2021, ALLEN and HARRIS flew out of the Dayton, Ohio airport and arrived at LAX. These reservations were made with the email account ██████████████ and telephone number ██████████ (the "8483 Phone"). Significantly, when I asked ALLEN for his phone number on May 5, 2022,

ALLEN provided me with the 8483 Phone number. I subsequently called the 8483 Phone and spoke to ALLEN; therefore, I believe the 8483 Phone was primarily used by ALLEN.

22.     American Airline records reflect that ALLEN and HARRIS traveled via American Airlines on December 1, 2021, from LAX (Los Angeles) to DFW (Dallas Forth Worth) to DAY (Dayton). The original flight started at 7:00 a.m. Each travelled via a one-way ticket costing $283.20.  The tickets were paid for with a Visa credit card number ending in 7103.

23.     Law enforcement performed a toll analysis of 7000 Phone. Between November 29, 2021, to December 1, 2021, the 7000 Phone called the phone number ████████ five (5) times. I conducted an open internet search and learned that the number ████████ belongs to The Garland Hotel located at 4222 Vineland Ave., North Hollywood, CA 91602.

24.     On December 10, 2021, in response to a Federal Administrative Subpoena, I received information from the Garland Hotel confirming a reservation from November 29, 2021, to December 1, 2021, for ALLEN. The Garland Hotel provided the following additional information regarding ALLEN's reservation:

    a.  The phone number associated with the reservation was the 7000 Phone, and the email associated with the reservation was ████████.

    b.  The credit card used to make the reservation was a Mastercard credit card number ending in 3252 with an expiration of 9-25-2021.

25.     Investigators spoke with the Garland Hotel front office manager regarding the subpoenaed information. Investigators learned that during the stay, ALLEN and HARRIS used

9

two credit cards: a Visa card ending in 7103, which paid for part of the room, and the credit card used to make the reservation, a Master card ending in 3252.

26.     Included in the subpoena return from The Garland Hotel was a photograph from the front reception desk when Clay ALLEN checked into the hotel for the above reservation on November 29, 2021. ALLEN was wearing a distinctive brown sweatshirt with a ying and yang symbol and a yellow smiley face. I was able to compare this surveillance photo with ALLEN's official state of Ohio driver's license photograph and ALLEN's arrest photographs, and confirmed his identity.

27.     On December 9, 2021, I received subpoena results regarding the surveillance video from UPS Store #5892 located at 2416 W. Victory Blvd., Burbank, CA 91506l, which is where the package originated. The video surveillance shows the events surrounding the mailing of the UPS package with tracking number 1Z4F972W1255409659 seized on December 2, 2021. In the surveillance video, I observed ALLEN, positively identified as described above, mailing the box with tracking number 1Z4F972W1255409659 on November 30, 2021. In the UPS surveillance video ALLEN is wearing the same brown sweatshirt with ying and yang symbol and a yellow smiley face as when he checked into The Garland Hotel on the previous day.

28.     Significantly, the UPS store where ALLEN shipped the package—2416 W. Victory Blvd., Burbank, CA 91506l—is located approximately six miles from the Garland Hotel. According to Google Maps, it would take approximately seventeen minutes to drive between the two locations, as depicted in the Google Map image below:

10



29.     Based on my training and experience, I know that drug traffickers frequently use the postal service and private shipping companies to send drugs throughout the United States. I also know that California is a known source location for drugs, and that drug traffickers

11

operating in the Southern District of Ohio will frequently book one-way tickets to California to send to themselves and/or trusted associates packages containing drugs. These trips, which typically last for only a few days, conclude with the purchase of a one-way ticket back from California to return to the trafficker's home.

30. The evidence suggests that ALLEN and HARRIS traveled to California for this purpose. They departed Dayton, Ohio, on Monday, November 29, 2021, and returned to Dayton on Thursday, December 2, 2021. The package—which ALLEN sent from California to HARRIS's address in Dayton—was scheduled for delivery within three days. This coincides with ALLEN and HARRIS's itinerary, which had them returning to Dayton just prior to the package's expected delivery date.

**E. ALLEN and HARRIS's flight records reveal a pattern consistent with drug trafficking.**

31. As part of my investigation, I reviewed records of ALLEN and HARRIS's airline travel on several airlines from approximately April 2020 through January 2022. These records revealed that ALLEN and HARRIS frequently made trips to Los Angeles, California, that were two to three days in duration, consistent with drug trafficking. These trips were booked using several different phone numbers, email addresses, credit cards, and addresses. Significantly, I learned that the email address ███████████████████ was sometimes used to book these trips for both ALLEN and HARRIS.

12

32.     The table below summarizes some of the information contained in the records

regarding ALLEN and HARRIS's flight history:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

| Person | Date | From | To | Airline | Phone Number | Email |
|--------|------|------|-----|---------|--------------|-------|
| Clay Allen | 4/24/20 | Dayton | Los Angeles | Delta | ██████ | ██████ |
| Clay Allen | 4/26/20 | Los Angeles | Dayton | Delta | ██████ | ██████ |
| Clay Allen | 5/4/20 | Dayton | Los Angeles | Delta | ██████ | ██████ |
| Clay Allen | 5/6/20 | Los Angeles | Dayton | Delta | ██████ | ██████ |
| Clay Allen | 5/16/20 | Los Angeles | Columbus | Delta | ██████ | ██████ |
| Clay Allen | 5/24/20 | Cincinnati | Los Angeles | American | ██████ | ██████ |
| Clay Allen | 5/27/20 | Los Angeles | Cincinnati | American | ██████ | ██████ |
| Clay Allen | 7/21/20 | Dayton | Los Angeles | Delta | ██████ | ██████ |
| Clay Allen | 8/13/20 | Columbus | Los Angeles | American | ██████ | ██████ |
| Clay Allen | 8/15/20 | Los Angeles | Columbus | Delta | ██████ | ██████ |
| Clay Allen | 8/21/20 | Dayton | Los Angeles | Delta | ██████ | ██████ |
| Dazzling Harris | 8/23/20 | Los Angeles | Dayton | Delta | ██████ | ██████ |
| Clay Allen | 10/16/20 | Dayton | RD, NC | Delta | ██████ | ██████ |
| Clay Allen | 10/18/20 | RD, NC | Dayton | Delta | ██████ | ██████ |

14

| | | | | | | |
|---|---|---|---|---|---|---|
| Clay Allen | 3/14/21 | Dayton | Los Angeles | American | ███████ | ████████████ |
| Clay Allen | 3/16/21 | Los Angeles | Dayton | American | | |
| Dazzling Harris | 4/15/21 | Dayton | Los Angeles | American | 937-993-7000 | ████████████ |
| Dazzling Harris | 4/16/21 | Los Angeles | Dayton | American | ████████ | ████████████ |
| Clay Allen | 5/15/21 | Dayton | Los Angeles | Delta | 937-993-7000 | ████████████ |
| Dazzling Harris | 5/15/21 | Dayton | Los Angeles | Delta | 937-993-7000 | |
| Clay Allen | 5/17/21 | Los Angeles | Dayton | Delta | 937-993-7000 | |
| Dazzling Harris | 5/17/21 | Los Angeles | Dayton | Delta | 937-993-7000 | |
| Clay Allen | 5/26/21 | Dayton | Los Angeles | American | ████████ | ████████████ |
| Clay Allen | 6/14/21 | Dayton | Los Angeles | American | ████████ | ████████████ |
| Clay Allen | 6/16/21 | Los Angeles | Dayton | American | | |
| Dazzling Harris | 6/24/21 | Los Angeles | Dayton | American | | |
| Clay Allen | 6/24/21 | Los Angeles | Dayton | American | | |
| Dazzling Harris | 6/25/21 | Los Angeles | Dayton | American | 937-993-7000 | |

15

| Clay Allen | 6/25/21 | Los Angeles | Dayton | American | ███████ | |
| Clay Allen | 7/23/21 | Dayton | Los Angeles | Delta | ███████ | ████████ |
| Clay Allen | 7/25/21 | Los Angeles | Dayton | Delta | ███████ | ████████ |
| Clay Allen | 8/19/21 | Dayton | Los Angeles | Delta | | ████████ |
| Clay Allen | 8/21/21 | Los Angeles | Dayton | American | ██████ | |
| Dazzling Harris | 8/29/21 | Miami | Dayton | Delta | 937-993-7000 | ████████ |
| Clay Allen | 10/2/21 | Dayton | Los Angeles | Delta | ██████ | |
| Clay Allen | 10/4/21 | Los Angeles | Dayton | Delta | ██████ | ████████ |
| Clay Allen | 11/29/21 | Dayton | Los Angeles | Delta | ██████ | ████████ |
| Dazzling Harris | 11/29/21 | Dayton | Los Angeles | Delta | ██████ | |
| Clay Allen | 12/1/21 | Los Angeles | Dayton | American | 937-993-7000 | ████████ |
| Dazzling Harris | 12/1/21 | Los Angeles | Dayton | American | | _ |
| Clay Allen | 1/27/22 | Los Angeles | Dayton | American | ██████ | |

16

33.     As depicted in the chart above, flights were booked in ALLEN's name, and with the 8483 Phone—a known phone number for ALLEN—using email accounts that appear to belong to female associates. For example, in addition to the Account, ALLEN had flights booked with the email addresses ███████████████. I believe, from information learned during my investigation, that ██████ is the daughter of ALLEN's sister, ██████, making ██████ ALLEN's niece. Based on my training and experience, I know that it is common for drug traffickers to have close associates, such as romantic partners and relatives, book drug-trafficking related travel on the trafficker's behalf. Traffickers know that using different email addresses, phone numbers, and addresses makes it more difficult for law enforcement to track their movements and pattern of activity.

34.     Further bolstering my belief that most, if not all, of ALLEN's travel is drug-trafficking related is information learned from a source of information ("SOI-1").[3] In 2018, SOI-1 provided information to law enforcement regarding the ██████ ("██████") DTO. ██████ is ALLEN's brother, who uses the nickname "Fly."[4] I believe it is likely that the user of the ██████ email address, which was used to purchase multiple flights to and from California for ALLEN, as depicted in the table above, belongs to ██████.

_____

[3] SOI-1 has never provided materially false information; therefore, I believe SOI-1 is a trustworthy and reliable source of information.

[4] I know that ██████'s nickname is "Fly" based on my review of other DEA agents' reports and my review of a Facebook profile picture which depicts ██████ using the name "Fly."

35.     Additionally, I am aware of ███████'s history of involvement with narcotics trafficking. I conducted a historical review of DEA narcotics investigations and observed a 2010 debriefing report in which a confidential source said that ████████████ (████████) was involved in heroin trafficking in Dayton, Ohio and was obtaining the heroin in Florida at that time.  I also reviewed a 2014 DEA report in which, during an interview, a Source of Information said that ███████████ (████████) was involved in narcotics trafficking. At that time, ████████ owned a storefront in downtown Dayton, Ohio called "Status," which, according to the Source of Information, was a center of this drug trafficking organization for poly-drug distribution and money laundering. In December 2015, DEA investigators interviewed an Ohio Bureau of Criminal Investigation confidential source in which s/he identified ████████████ (████████) and ███████████████ as brothers who were involved in heroin trafficking. This confidential source said that ████████████ was up████████████████████████, died of a heroin overdose. This review of prior DEA investigative reports is not exhaustive but is representative of the continued criminal activity of ████████.

36.     Based on my knowledge of the investigation as a whole, including SOI-1's information that ████████ has been involved in a DTO as recently as 2018, I believe it is likely that ████████ either booked flights on ALLEN's behalf using the ████████████ account, or—consistent with what I observed regarding the ████████████████ and ████████████████ accounts, which I describe in detail below—████████ provided

18

ALLEN with access to the ███████████ account so that ALLEN could book the flights for himself.

37.     SOI-1 also provided phone numbers for ███████, ALLEN's sister, and told investigators that ██████████ was responsible for moving narcotics proceeds and operating stash house locations throughout the Dayton, Ohio area. SOI-1 identified another of ALLEN's relatives, ██████████ ("████████"), as a participant in the DTO. I learned that ██████ was arrested on March 2, 2018, in Arizona for possessing more than five kilograms of cocaine in her car. During that incident, ██████████ told police that her intended destination was Dayton, Ohio.

38.     I believe that ██████████ is likely the creator of the email account ████████████████████. I further believe that ALLEN's sister, ██████████, whom I described above, is the mother of █████████, based on my review of law enforcement databases placing ██████ and ██████ at many of the same addresses.[5] Additionally, I requested and received subscriber and toll data for ██████████'s phone number (████████████) and observed calls to ██████████, which, based on my review of law enforcement databases, I believe is the phone number used by ██████████. Further, I observed calls between ████████ ██████'s telephone number (████████████) and ██████████, which is attributed to ██████████ ██████, and between ██████████'s telephone number (████████████) and the phone number

_____

[5] ██████████ was born in 1969, and ██████████ was born in 1984, which is consistent with ██████ being ████████'s mother.

19

██████████, which law enforcement databases reflect belongs to ████████████,[6] who is an

ALLEN family relation.[7] I believe that ██████████ is the creator of the

█████████████ email account, which was used to book a flight to California for

ALLEN less than one month after the ██████████████ was used to book a flight, as

depicted in the chart above. For all of these reasons, I believe that I have identified the correct

phone number and email address for ██████████.

    39.    I know, based on my training and experience, that trips of short duration (such as

two or three days) to common drug source cities are characteristic of drug trafficking trips. Los

Angeles, California, is a known source location for drugs. Based on my knowledge of the

investigation as a whole, including information that SOI-1 provided about ██████████, I

believe it is likely that ALLEN, or someone acting on his behalf, used the

█████████████ email account to book ALLEN's drug trafficking related travel. I

believe it is likely that ██████████ either booked flights on ALLEN's behalf using the

█████████████ account, or—consistent with what I observed regarding the

---

[6] ██████████ has a history of drug trafficking.

[7] I observed video jail calls of ALLEN when he was at the Shelby County Jail and observed ALLEN speak with ██████████ and ██████████. I further noted in previous DEA investigative recordings that a DEA Source of Information stated that in 2002, ██████████ was aware of the narcotics trafficking of ██████████ and allowed ██████████ to use her house as a base of operations for narcotics trafficking. I conducted research and learned that ██████████ resides at ████████████████, which is an address I have personally observed ALLEN visit multiple times



████████████████████ and ████████████ accounts, which I describe in more

detail below—████████ provided ALLEN with access to the ████████████████

account so that ALLEN could book the flights himself. I know that one of the two phone

numbers used in the ████████████████ flight bookings—the 8483 Phone—is

ALLEN's phone number, as described above. The other phone number, ██████████, is

associated with ████████, according to law enforcement databases.

40.     The evidence shows that since at least April 2020, ALLEN and HARRIS have

made multiple trips to Los Angeles, California—a known source location for drugs—that were

extremely short in duration. My investigation has revealed no legitimate ties between ALLEN,

HARRIS, and Los Angeles—such as employment or local relatives—that would provide

alternative explanations for the trips. I believe that ALLEN's method of operation for his drug

trafficking involved him flying to Los Angeles and mailing drugs to locations in Dayton, Ohio,

consistent with the intercepted packages in 2019 and 2021.

**F.  Search warrant results for the email address** ████████████████████ **revealed
the existence of the email account** ████████████████**.**

41.     On December 30, 2022, the Honorable Caroline H. Gentry, U.S. Magistrate

Judge, authorized a search of the Yahoo email account ████████████████████

(hereinafter, the "Dazzling Yahoo Account").

42.     Upon review of information returned in response to the search warrant on the

Dazzling Yahoo Account, I learned that the user of email address ████████████████

21

signed into the Dazzling Yahoo Account on May 11, 2021, and again on November 8, 2021. Communications from Google to the Dazzling Yahoo Account revealed that the Dazzling Yahoo Account is the recovery email for the email address ███████████████ .

43.     I believe that the user of ███████████████ is ALLEN because the email address reflects not only his name, but also his age—49—at the beginning of 2021, the year the messages were sent.[8]

44.     According to HARRIS, she and ALLEN have known each other for approximately six years. I know this because on January 9, 2023, ALLEN publicly filed a letter authored by HARRIS in connection with his pending drug charges in case number 3:22-cr-076.[9] In this letter, dated December 28, 2022, HARRIS wrote that she met ALLEN "roughly 6 years ago" and described their relationship as being one of "good friends" who then "became soul mates [sic]." Based on HARRIS's characterization of her relationship with ALLEN, I believe it is consistent that the Dazzling Yahoo Account is the recovery account for ALLEN, and/or that ALLEN and HARRIS shared access to the Dazzling Yahoo Account.

//

//

---

[8] ALLEN's date of birth is ███████████ . He turned 50 years old on ███████████ , which means he was likely 49 years old when the ███████████████ email account was created.

[9] *See* Doc. 38.

### G. The evidence suggests that ALLEN and HARRIS funded their drug trafficking-related travel using money fraudulently obtained through the government's pandemic assistance programs.

45.     As I described in more detail above, the evidence suggests that ALLEN and

HARRIS went on several drug trafficking trips to California and elsewhere. I believe that they

used the money they obtained from fraudulently applying for pandemic loans—which I describe

in detail in another section below—to fund those trips.

46.     Based on my review of flight records, [10] I have identified ALLEN's thirteen trips

in the chart below as drug trafficking trips:

| Trip | Dates | Price Paid at Booking |
|------|-------|----------------------|
| 1 | Leaving 4/24/20 and returning 4/26/20 | $515.20 |
| 2 | Leaving 5/4/20 and returning 5/6/20 | $532.00 |
| 3 | Leaving 5/24/20 and returning 5/27/20 | Unknown |
| 4 | Leaving 8/13/20 and returning 8/15/20 | Partial fees obtained from Delta records states that the return portion of the trip was $247.60 |
| 5 | Leaving 8/21/20 and returning 8/23/20 | $340.20. |
| 6 | Leaving 10/16/20 and returning 10/18/20 | $534.20 |
| 7 | Leaving 3/14/21 and returning 3/16/21 | Unknown |
| 8 | Leaving 5/15/21 and returning 5/17/21 | $428.20 |

---

[10] As of the writing of this affidavit, I have only received airline records from Delta Airlines and American Airlines.

| 9 | Leaving 6/14/21 and returning 6/16/21 | $513.39 |
| 10 | Leaving 6/24/21 and returning 6/25/21 | $514.90 |
| 11 | Leaving 7/23/21 and returning 7/25/21 | Unknown |
| 12 | Leaving 10/2/21 and returning 10/4/21 | $496.40 |
| 13 | Leaving 11/29/21 and returning 12/1/21 | Departing: $283.20; Returning: $566.40 |

47. During some of these trips, ALLEN traveled with a second person. The cost of the second person's ticket was not excluded from my calculation because both tickets were booked at the same time and billed to one individual. Using the information contained in the chart above, I determined that the average plane ticket cost per trip was $553.36. Thus, for thirteen trips, the average total cost of air travel was $7,193.75.

48. I then took the total trips and calculated the cost of lodging and per diem for one person for these trips using the U.S. General Services Administration for standard government travel rates in the year the travel was conducted. Rental car rates were pulled from actual rental cars rented by HARRIS during a June 24, 2021, visit in which she paid $139.89 per day for a rental car from Fox Rental Car from the Los Angeles Airport.[11] The following tables illustrate the costs associated with each of the thirteen trips I included in the chart above:

---

[11] I learned this information while reviewing the results of a federal search warrant for her email address, ███████████████████

| Trip 1: Leaving 4/24/20 and returning 4/26/20 | | | |
|---|---|---|---|
| Date | 24 | 25 | 26 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

| Trip 2: Leaving 5/4/20 and returning 5/6/20 | | | |
|---|---|---|---|
| Date | 4 | 5 | 6 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

//

//

//

//

//

25

| Trip 3: Leaving 5/24/20 and returning 5/27/20 | | | | |
|---|---|---|---|---|
| Date | 24 | 25 | 26 | 27 | |
| Hotel | 182 | 182 | 182 | 0 | 546 |
| Rental Car | 139.89 | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 66 | 49.5 | 181.5 |
| Total | | | | | 1147.17 |

| Trip 4: Leaving 8/13/20 and returning 8/15/20 | | | |
|---|---|---|---|
| Date | 13 | 14 | 15 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

//

//

//

//

//

26

| Trip 5: Leaving 8/21/20 and returning 8/23/20 | | | |
|---|---|---|---|
| **Date** | 21 | 22 | 23 | |
| **Hotel** | 182 | 182 | 0 | 364 |
| **Rental Car** | 139.89 | 139.89 | 139.89 | 419.67 |
| **Per Diem** | 49.5 | 66 | 49.5 | 165 |
| **Total** | | | | 948.67 |

| Trip 6: Leaving 10/16/20 and returning 10/18/20 | | | |
|---|---|---|---|
| **Date** | 16 | 17 | 18 | |
| **Hotel** | 182 | 182 | 0 | 364 |
| **Rental Car** | 139.89 | 139.89 | 139.89 | 419.67 |
| **Per Diem** | 49.5 | 66 | 49.5 | 165 |
| **Total** | | | | 948.67 |

//

//

//

//

//

27

| Trip 7: Leaving 3/14/21 and returning 3/16/21 | | | |
|---|---|---|---|
| Date | 14 | 15 | 16 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

| Trip 8: Leaving 5/15/21 and returning 5/17/21 | | | |
|---|---|---|---|
| Date | 15 | 16 | 17 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

//

//

//

//

//

28

| Trip 9: Leaving 6/14/21 and returning 6/16/21 | | | |
|---|---|---|---|
| Date | 14 | 15 | 16 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

| Trip 10: Leaving 6/24/21 and returning 6/25/21 | | |
|---|---|---|
| Date | 24 | 25 | |
| Hotel | 182 | 0 | 182 |
| Rental Car | 139.89 | 139.89 | 279.78 |
| Per Diem | 49.5 | 49.5 | 99 |
| Total | | | 560.78 |

//

//

//

//

//

//

29

| Trip 11: Leaving 7/23/21 and returning 7/25/21 | | | |
|---|---|---|---|
| Date | 23 | 24 | 25 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

| Trip 12: Leaving 10/2/21 and returning 10/4/21 | | | |
|---|---|---|---|
| Date | 2 | 3 | 4 | |
| Hotel | 182 | 182 | 0 | 364 |
| Rental Car | 139.89 | 139.89 | 139.89 | 419.67 |
| Per Diem | 49.5 | 66 | 49.5 | 165 |
| Total | | | | 948.67 |

//

//

//

//

//

30

| Trip 13: Leaving 11/29/21 and returning 12/1/21 | | | |
|---|---|---|---|
| **Date** | 29 | 30 | 1 | |
| **Hotel** | 182 | 182 | 0 | 364 |
| **Rental Car** | 139.89 | 139.89 | 139.89 | 419.67 |
| **Per Diem** | 49.5 | 66 | 49.5 | 165 |
| **Total** | | | | 948.67 |

49.     Based on the calculations contained in the tables above, I determined that the estimated total cost for hotel, food, and rental car for the thirteen trips is approximately $11,195.

50.     I then combined the cost of travel ($7,193.75) with the cost of food, lodging, and rental car ($11,195), and found that the approximate total cost of the thirteen trips is $18,389.40. This total is significant because, as I explain in detail in the sections that follow, ALLEN had been approved for $18,657 in PPP assistance for COVID-related unemployment in April 2021, shortly before the first trip. I believe, for all the foregoing reasons, as well as the additional reasons I give below, that ALLEN used pandemic assistance funds to pay for his drug trafficking trips to and from drug source locations.

51.     Finally, I combined the methamphetamine weight of the 2019 package (approximately 2,374.9 grams) and the 2021 package (approximately 2,814.1 grams)[12] that were seized and attributed to ALLEN. The average weight from these two packages is 2,594.5 grams. So, if ALLEN had sent an average of 2,594.5 grams of methamphetamine to Dayton on each trip to California, the estimated approximate total for the thirteen trips is 33,728.5 grams. I know, based on my training and experience, that the street value of methamphetamine is approximately $50.00 per gram; therefore, the estimated total street value of the drugs ALLEN sent to Dayton for these thirteen trips is approximately $1.6 million.

**H. The evidence suggests that ALLEN and HARRIS have fraudulently applied for and received pandemic-related financial assistance, including business loans and unemployment funds.**

**i.      Background on COVID-related aid**

52.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions in forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP").

---

[12] The fentanyl from the 2021 package (996 pills weighing approximately 107 grams) was not included for purposes of averaging the drug weight from the two packages; therefore, this is a conservative estimate.

53. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

54. A PPP loan application must be processed by a participating financial institution ("the lender"). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan. The lenders submit the information over the internet, thus consisting of wire communications, to the SBA. The SBA's computer server to receive lender information is located in the Eastern District of Virginia ("EDVA"). As a result, this process normally involves the sending and receiving of interstate wires. As detailed more below, the TARGET SUBJECT(S) submitted multiple PPP loan applications to Capital Plus Financial, whose PPP funding servers are located outside the Southern District of Ohio.

33

55.     PPP loan proceeds must be used by the business for certain permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses a certain percentage of the PPP loan proceeds on payroll expenses.

56.     The Economic Injury Disaster Loan ("EIDL") program is an SBA program that provide low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. The CARES Act also authorizes the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorizes the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance is determined by the number of employees the applicant certifies are employed by the company. The advances do not have to be repaid. An advance can be made before a loan is accepted or declined.

57.     In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the timeframe preceding January 31, 2020. The applicant must also certify that all of the information in the application is true and correct to the best of the applicant's knowledge. Any funds issued under an EIDL or EIDL advance are issued directly by the SBA.

34

EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtains a PPP loan, the EIDL funds cannot be used for the same purpose as the PPP funds.

58. The EIDL loan process is completed through an online loan application with the SBA. As part of the loan disbursement process, the SBA utilizes a computer server located in EDVA to receive data and then to notify the U.S. Treasury Department to make payment. This process normally involves the sending and receipt of interstate wires.

**ii. Background of the Unemployment Insurance System**

59. The Social Security Act of 1935 created the modern day federal and state unemployment insurance (UI) system. This system is designed to provide monetary benefits to qualifying individuals who have become unemployed for reasons beyond their control. The UI system serves two primary purposes: first, to lessen the effects of unemployment through direct government cash payments to laid-off workers; and second, to ensure that a worker's life necessities are provided for on a weekly basis while the worker seeks employment.

60. State unemployment systems and benefits are considered joint state and federal enterprises administered by State Workforce Agencies (SWAs). In Ohio, the relevant SWA is the Office of Unemployment Insurance Operations, which is part of the Ohio Department of Job and Family Services (the "Ohio SWA"). Other states administer their respective UI programs through analogous state-run agencies. Regardless of state, the U.S. Department of Labor administers the funds necessary to cover the associated administrative costs, personnel salaries,

35

office expenses, and computer equipment for each of the SWAs.

61.     When an unemployed person exhausts state unemployment benefits, these benefits may be supplemented with federal funds appropriated by the U.S. Department of Labor. To date, the federal government is specifically providing supplemental benefits to the various states due to the ongoing COVID-19 pandemic.

62.     On March 18, 2020, the Families First Coronavirus Response Act (FFCRA) became law. This Act provides state unemployment insurance agencies additional flexibility and administrative funding to respond to the COVID-19 pandemic. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law. The CARES Act expands the individual states' ability to provide unemployment insurance for workers impacted by the COVID-19 pandemic, including workers who are not otherwise eligible for unemployment benefits.

63.     An associated COVID-19 assistance program is the Federal Pandemic Unemployment Compensation (FPUC) program. The FPUC allowed eligible individuals who are collecting certain UI benefits, (including regular unemployment compensation), to receive an additional $600 in weekly federal benefit for periods of unemployment ending on or before July 31, 2020. Another COVID-19 pandemic assistance program is the Pandemic Emergency Unemployment Compensation (PEUC) program, which allows eligible individuals who have exhausted UI benefits to receive up to 13 weeks of additional federally funded benefits.

64.     For an unemployed worker to receive UI benefits, he/she must file a UI claim,

which can be submitted in person, over the telephone, or via the Internet. Currently, most UI claims are filed online through a state SWA website. To establish eligibility for UI benefits, a worker must demonstrate a certain level of earnings over several calendar quarters immediately preceding the filing of the UI claim. The amount of unemployment benefits a UI claimant receives is determined by a variety of factors, to include the length of his previous employment and the amount of wages previously earned.

65. The SWA approves or rejects submitted UI claims following a review of the content and accuracy of the information set forth in the UI claim. If the UI claim is approved, the SWA will then issue UI benefits either weekly or bi-weekly via either a debit card system or direct deposit system.

66. On a weekly or bi-weekly basis, claimants are required to fill out a Continued-Claim Form, which must be mailed back to the SWA. Claimants can also re-certify their continued unemployed status via the SWA's website or by telephone. The purpose of the Continued-Claim Form is to ensure the individual claimant is in fact still unemployed. Once the Continued-Claim Form is received by the SWA, payment is authorized and benefits for that period are either reloaded onto the claimant's existing debit card or resent via direct deposit.

67. The amount of weekly UI benefits paid to any claimant are calculated based upon a review of the claimant's prior earnings, as reported by their employer for a specified time period, called the "base wage" period. These wages are reported to the appropriate SWA on a Quarterly Wage and Withholding Report. Each Quarterly Wage and Withholding Report

37

contains various blank spaces for the employer to enter specific information, to wit: the employer's name, address, SWA account number, along with the employee's name, social security number (SSN), and the wages earned by the employee during the calendar quarter in question. Employers are expected to file these reports at the end of each calendar quarter.

68.     Prior to submitting these quarterly reports, employers must register with their SWA by submitting a Registration Form for Commercial Employers. This form enables the SWA to learn about a company's existence and causes the SWA to assign an account number to the company.

69.     SWAs specifically inquire of UI claimants during the application process if they are receiving UI benefits from any other states. Claimants are legally prohibited from simultaneously collecting UI benefits from more than one state. Claimants that become unemployed and qualify for UI benefits can file for UI from a state other than their state of residence, so long as their out-of-state wages have been properly reported to the other state where the work was performed.

70.     To prevent, and otherwise inhibit fraud, SWAs capture certain data surrounding the interaction between an individual and the UI system. Each time a claim is submitted or accessed in the SWA's system, a digital footprint is created. Although individual SWAs utilize their own unique IT systems, the typical data collected includes the claimant's name, along with the dates, times, and an IP address associated with the electronic device which was used in filing or accessing a UI claim. The SWA systems tie this information to the user-entered information

captured to facilitate the claim (for example, name, address, social security number, bank account numbers, and bank routing numbers). It is through the analysis of this IT data that the SWAs and investigating agents can identify fraudulent trends and tendencies associated with suspected fraudulent UI claims.

71.    Even after submitting a UI claim to the Ohio SWA, an applicant can log into the Ohio SWA online system (the "Ohio SWA Database") and modify certain information associated with the claim, including the applicant's contact information and bank account information. As I describe in detail below, I believe that HARRIS and ALLEN engaged in fraudulently applying for the Paycheck Protection Program (PPP).

### iii.    Dazzling Harris' Fraudulent Unemployment Insurance Claim

72.    On or about June 16, 2020, an Ohio PUA claim was filed in Dazzling HARRIS' name and Social Security Number (SSN). The residential and mailing address associated with the claim was ███████████████████████████, and an email address of ███████████████████. A review of the HARRIS's UI application revealed a claim of being a Food Server, which was not substantiated through the submission of the appropriate tax forms and according to HARRIS's Ohio Wage and Earning records.

73.    According to HARRIS's application, she provided support documents including HARRIS's Ohio Identification Card, SSN card, "selfies" (meaning photographs one takes of oneself), and an earning statement from Go Wireless Cincinnati, LLC (Go Wireless) dated December 26, 2019.

39

74.     According to HARRIS's Ohio UI "Continued-Claim Form," from March 14, 2020, to approximately April 24, 2021, HARRIS reported no earnings. From June 19, 2020, to May 26, 2021, approximately $22,194 was electronically transferred from the government onto HARRIS's U.S. Bank ReliaCard as a result of HARRIS's false representations regarding her lack of earnings.

75.     According to Ohio Wage and Earning records, HARRIS was in fact employed and earning money during this period. HARRIS received approximately $16,856.39 in 2020 from Go Wireless, and approximately $5,075.53 from Go Wireless and $928.80 from PF Staffing, LLC in 2021.

### iv.     Clay Allen's Fraudulent UI Claim

76.     On or about June 15, 2020, an Ohio PUA claim was filed in ALLEN's name and Social Security Number (SSN). The residential and mailing address associated with the claim was ███████████████████████. Over the course of his Ohio PUA claim, ALLEN used the following email addresses ██████████████, ██████████████, and ██████████████. In ALLEN's UI application, ALLEN claimed he was an independent contractor performing janitorial duties, which was not substantiated through the submission of the appropriate tax forms.

77.     According to ALLEN's Ohio profile notes,[13] ALLEN provided a 2019 earning statement from Go Wireless for his Employment Verification.  According to Ohio Wage and Earning records, ALLEN had no wage records in 2019. The evidence suggests that ALLEN either falsified his 2019 earning statement, or failed to report his earnings as required. I know, through my training and experience, that it is common for drug traffickers to falsify employment documents for the purpose of misrepresenting their employment status to either the federal or state government or to pre-trial, probation, or parole services. Based on the lack of records with Ohio Wage and Earning, I believe it is likely that ALLEN was never an employee of Go Wireless and that his 2019 earning statement submitted in furtherance of obtaining PUA was false.

78.     According to ALLEN's application, support documents were provided to include ALLEN's Ohio Driver License, SSN card, birth certificate, and a Day Air Credit Union account statement for member number ███ from February 2021, which included his name and a mailing address of ████████ .

79.     According to ALLEN's Ohio UI "Continued-Claim Form," from March 21, 2020, to approximately September 4, 2021, ALLEN reported no earnings.  From June 18, 2020, to January 12, 2022, approximately $33,975 was electronically transferred into Day Air Credit

---

[13] State of Ohio notes of documents provided by Ohio PUA claimants.

Union account ▆▆▆▆ in response to ALLEN's UI application. I know ALLEN's purported lack of income during this period is false based on ALLEN's receipt of an $18,675 PPP loan, which I discussed above and discuss further below. This loan was approved on April 5, 2021, and disbursed to ALLEN on April 29, 2021.

### v.    Harris's PPP Loan Scheme

80.    On January 12, 2023, an investigator with the U.S. Department of Labor in Columbus, Ohio, informed me that HARRIS received a PPP loan for $18,230, which was approved on April 5, 2021, through Capital Plus Financial. According to HARRIS's KeyBank records, HARRIS received the funds on April 29, 2021. I learned that, within weeks of receiving the PPP loan, HARRIS paid for a Brazilian butt-lift and liposuction surgery in Florida, as well as multiple trips to and from California. As I explain in further detail below, the evidence suggests that HARRIS did not qualify for a PPP loan and did not use the funds for legitimate business expenses.

81.    In the aforementioned December 28, 2022, letter HARRIS submitted to federal district court on ALLEN's behalf, HARRIS said that she was the CEO and owner of Girly Tingz, LLC, which is a registered business in the State of Ohio through the Secretary of State. Further, Girly Tingz has a tax ID number EIN of 85-3050784 which was issued in approximately September 2020.  I conducted a public records search for information regarding Girly Tingz, LLC and did not find any evidence of a business operating under that name in the Southern District of Ohio.  I know, based on my training and experience, that the vast majority of

42

businesses have a web presence, meaning there is an online record of their existence. For example, I know that most businesses have their own websites with information about the business, including relevant contact information. I also know that many businesses have a social media presence, such as a public Facebook page. Further, I conducted a public records search of Girly Tingz, LLC, and discovered that in 2022 the state of Ohio's Taxation Department obtained two judgments against Girly Tingz, LLC for unpaid sale taxes.[14] These liens suggest that Girly Tingz, LLC is not operating in accordance with state tax laws, and the lack of an online presence suggests that Girly Tingz, LLC, is not currently in business.

82.     Additionally, a law enforcement search of Ohio Secretary of State records revealed that in February 2022 HARRIS filed for a second business called Dazzling Boutique. An internet search of this business reveals a Facebook record for Dazzling Boutique, LLC at ███. ███████████████████████. Law enforcement learned from USPS postal inspectors that this address is a post office box at a post office location near Columbus, Ohio. USPS records state that it was assigned to Dazzling Boutique from May 24, 2021, to March 11, 2022, and that no packages had been received at that address.

83.     I also learned, among other things, that HARRIS has made representations regarding her finances that are inconsistent with her lifestyle. For example, my review of the

---

[14] On April 30, 2022, in case number 2022-SCJ-222222, a lien of $3,366.87 was entered against Girly Tingz. On November 5, 2022, in case number 2022-SCJ-233699, a lien of $6,627.71 was entered against Girly Tingz.

contents of the Dazzling Yahoo Account revealed that she has applied for public assistance, such as Section 8 housing and utilities assistance. She has requested utilities assistance through PiPP/HEAP Miami Valley Community Action Partnership program. The search warrant results of the Dazzling Yahoo Account further show she receives monthly Supplemental Security Income from the Social Security Administration for a child in a monthly amount of $691.00 or an estimated yearly income/payment of $8,292. Further, the search warrant results revealed that HARRIS receives child support from two other men in the amounts of $61.20 per month and $737.47 per month for an estimated yearly total of $9,584.04.

84. Law enforcement also received supporting banking documentation for HARRIS from her KeyBank account ending in #7398. Upon reviewing those records, law enforcement learned of the following income deposits:

| Date | Income Deposited | Source |
|---|---|---|
| 2/11/2021 | $739.79 | Go Wireless Payroll |
| 2/25/2021 | $494.22 | Go Wireless Payroll |
| 3/11/2021 | $392.39 | Go Wireless Payroll |
| 3/16/2021 | $115.38 | Go Wireless Payroll |
| 3/17/2021 | $4,200.00 | IRS Tax Refund |
| 3/25/2021 | $522.73 | Go Wireless Payroll |
| 4/8/2021 | $443.06 | Go Wireless Payroll |
| 4/16/2021 | $254.01 | Go Wireless Payroll |
| 4/22/2021 | $36.21 | Go Wireless Payroll |
| 4/28/2021 | $5,292.18 | TCS Treas 449 Tax Ref |
| 4/29/2021 | $18,230.00 | PPP Funding SBA Funding ▮▮▮▮▮▮ |
| | **$30,719.97** | **TOTAL** |

44

85.     The table below includes some of HARRIS's deposits and withdrawals from her Key Bank Account ending in #7398:

| Date | Withdrawal | Deposits |
|---|---|---|
| 2/7/2021 | | $200.00 |
| 3/14/2021 | | $160.00 |
| 3/18/2021 | $200.00 | |
| 3/24/2021 | | $990.00 |
| 4/10/2021 | | $100.00 |
| 4/14/2021 | | $160.00 |
| 4/14/2021 | | $996.42 |
| 4/29/2021 | $10,000.00 | |
| 5/1/2021 | | $980.00 |
| 5/1/2021 | | $1000.00 |
| 5/1/2021 | | $1000.00 |
| 5/1/2021 | | $20.00 |
| 5/1/2021 | | $1000.00 |
| 5/6/2021 | $1000.00 | |
| 5/14/2021 | $500.00 | |
| 6/15/2021 | | $40.00 |
| 6/15/2021 | | $320.00 |
| 6/15/2021 | | $140.00 |
| 7/8/2021 | | $280.00 |
| 7/20/2021 | $100.00 | |
| 7/20/2021 | | $550.00[15] |
| **TOTAL** | **$11,800.00** | **$7,936.42** |

[15] This is income she received from the United States Treasury for Advance Child Tax Credit Payment.

86.     Based on my training and experience, I know it is common for individuals who fraudulently receive loans to quickly spend or withdraw the money before the fraud can be detected. I know that HARRIS received the PPP loan on April 29, 2021, and on the same day, she withdrew $10,000.

87.     The KeyBank records further revealed out-of-state expenses related to travel or luxury expenditures during the same year, as depicted in the table below:

| Date | Description | Amount |
|------|-------------|--------|
| 3/19/2021 | Spectrum Image Coral Gables Florida | $200.00 |
| 4/19/2021 | Westin Los Angeles | $137.77 |
| 5/17/2021 | Westin Los Angeles | $208.39 |
| 5/18/2021 | Delta | $258.20 |
| 5/18/2021 | Delta | $258.20 |
| 6/16/2021 | Spectrum Image Coral Gables Florida | $500.00 |
| 6/22/2021 | United | $258.20 |
| 6/22/2021 | American | $256.70 |
| 6/22/2021 | United | $258.20 |
| 6/25/2021 | Westin Los Angeles | $194.50 |

88.     The law enforcement investigation has revealed that HARRIS flew down to Florida in late 2021 and had a cosmetic surgery performed with Spectrum Aesthetics in Miami, Florida. The cost of the Brazilian butt lift and liposuction was $4,500. I believe, based on my

46

training and experience, that the purchases made in the days and weeks following her receipt of the PPP loan are inconsistent with business operating expenses.

89.     I know, based on my training and experience, that there are income thresholds to qualify for these public assistance programs. Based on my review of her credit card usage, which reflects flights, lodging, and rental cars in relation to her frequent travel to California, it does not appear that she is financing these trips and services with legitimately earned money. I believe she is using proceeds from the DTO to finance her lifestyle.

90.     Additionally, I reviewed her credit card statements and bank records and concluded that they do not contain business expenses that would substantiate the need for the PPP loan she received from the Small Business Administration in April 2021, as reflected in the table above. The evidence suggests that HARRIS either grossly inflated or fabricated her business's finances in order to fraudulently obtain money from the federal government intended to aid businesses negatively impacted by the COVID-19 pandemic. I know that to obtain pandemic-related financial assistance, HARRIS must have submitted a loan application to the Small Business Administration (SBA) and federally insured banking institutions.[16]

---

[16] I have requested, but have not yet received, HARRIS's original pandemic-related loan applications. The website Propublica.org publishes recipients of PPP loans, and "Dazzling Harris" of Dayton, Ohio is listed as having a loan of $18,230 approved in April 2021, consistent with HARRIS's KeyBank records. *See* https://projects.propublica.org/coronavirus/bailouts/search?q=Dazzling+Harris&v=2 (last accessed January 17, 2023).

91.     My belief that HARRIS fraudulently represented her business's income to obtain pandemic-related aid is further bolstered by records I received from the probation office in Montgomery County, Ohio.[17] I reviewed the employment verification forms and paystubs HARRIS submitted from approximately June 20, 2020, through August 24, 2021. I know that probationers are required to submit proof of employment and income to their probation officers. HARRIS did not report any employment or income from her businesses. Instead, HARRIS reported employment with Go Wireless and T and T Graphics. The income she reported was likewise inconsistent with her lifestyle of frequent travel and luxury expenditures.

92.     Significantly, HARRIS failed to disclose her PPP payment to her probation officer as income; as stated above, she received the PPP funds on April 29, 2021. HARRIS continued providing paystubs and reports of her income to her probation officer that did not reflect the receipt of these funds. Further, HARRIS did not report any ownership or paid positions associated with her LLC business (e.g., CEO, CFO, or owner). Based on my training and experience, failing to report this information is strongly indicative of fraud.

//

//

---

[17] HARRIS was unsuccessfully discharged from probation in case number 2019 CR 02829 on January 10, 2022. HARRIS's probation, which stemmed from a vandalism conviction (fifth-degree felony), began approximately two years prior, on January 15, 2020.

48

### vi. ALLEN's PPP Loan Scheme

93. On January 13, 2023, the same agent with the U.S. Department of Labor in Columbus, Ohio, informed me that ALLEN received a PPP loan for $18,657, which was approved on April 5, 2021, through Capital Plus Financial. As I discuss in further detail below, after receiving the PPP loan funds on or about April 29, 2021, ALLEN applied for, and received, Pandemic Unemployment Assistance. In doing so, ALLEN failed to disclose the PPP loan as required, and instead reported no earnings each week. Based on my training and experience, ALLEN's failure to disclose the PPP loan as required is strongly indicative of fraud.

94. Additionally, from approximately December 3, 2021, to May 3, 2022, I physically surveilled ALLEN multiple times a week as part of my drug investigation. I observed that ALLEN frequently left his home located at ████████████████, and then proceed to ████████████████████, which is a private residence occupied by ████████████. On many occasions I observed ALLEN spend the daytime hours (roughly 10 a.m. to 5 p.m.) at ████████████████████. While ALLEN was spending the day at ████████████, investigators observed several other individuals arrive at the residence, stay a short period, then leave. Investigators identified the individuals who briefly visited ████████████. and know that they have a narcotics criminal history. Based on my training and experience, I believe that the individuals inside ████████████ were selling drugs based on the pattern of traffic to and from the residence.

49

95.     Further bolstering my belief that drug activity was being conducted at 3316 during my observation period is information I learned from my review of prior DEA narcotics investigations that took place at ███████████████. I observed in the case file that in approximately May of 2002, a DEA confidential source purchased approximately a quarter ounce of heroin from ALLEN from the residence of ████████, Dayton, Ohio. The narcotics transaction took place in a bedroom belonging to ALLEN, in which the CS stated that s/he observed scales, a plate with gel caps, an open box with a new Glock handgun, and approximately $7,000 cash laying in seven different stacks.

96.     I believe ALLEN's behavior from approximately December 3, 2021, to May 3, 2022, is inconsistent with legitimately seeking pandemic unemployment benefits. I saw no evidence that ALLEN was prevented from seeking employment or that he was isolating himself due to the COVID-19 pandemic.

### vii.     The Pandemic Unemployment Assistance Scheme

97.     Ohio's PUA payments were authorized under the CARES Act to provide unemployment benefits to support business owners, the self-employed, independent contractors, and others who do not qualify for traditional unemployment benefits. Based on my training, knowledge, and experience, I know that PUA applicants are required to self-certify that they meet a COVID-19 related reason for their unemployment. In order to receive PUA benefits, on a weekly or bi-weekly basis claimants are required to fill out a continued-claim form and submit it to the appropriate State Workforce Agency. It is rare for a PPP loan recipient that has received

50

funds to simultaneously receive unemployment credits under the ODJFS-PUA program. Based on my training, knowledge, and experience, I know this to be a strong indicator of fraud.

98.     As I describe in detail below, I learned that both HARRIS and ALLEN each separately applied for Pandemic Unemployment Assistance.

### a) HARRIS's PUA Scheme

99.     On January 13, 2023, the same agent with the U.S. Department of Labor in Columbus, Ohio, informed me that HARRIS received PUA from Ohio totaling $22,194, beginning June 16, 2020, and lasting through February 4, 2021. According to her PUA application with Ohio, her job was closed due to COVID-19. However, according to her Ohio wages, she was paid by Go Wireless Cincinnati all four quarters in 2020 and the first two quarters of 2021, which is consistent with the income she reported to her probation officer. In spite of receiving this income, HARRIS reported no earning each week to Ohio, even though her Ohio wage records say otherwise. The evidence suggests that HARRIS intentionally concealed her earnings in order to obtain PUA funds. The table below lists employee earnings HARRIS received from fiscal year 2020 through 2022, according to Ohio Wage and Earnings records:

//

//

//

| Harris's Employer | Wages Earned | Fiscal Year/Quarter |
|---|---|---|
| EXPRESS SERVICES INC. | $ 7,933.36 | 2022/3 |
| CROWN PERSONNEL SERVICES, INC. | $ 1,645.00 | 2022/2 |
| CROWN SERVICES 02, LLC | $ 931.42 | 2022/2 |
| EXPRESS SERVICES INC. | $ 1,946.25 | 2022/2 |
| CROWN PERSONNEL SERVICES, INC. | $ 3,808.00 | 2022/1 |
| PF STAFFING, LLC | $ 686.30 | 2021/4 |
| PF STAFFING, LLC | $ 242.50 | 2021/3 |
| Go Wireless Cincinnati LLC | $ 866.31 | 2021/2 |
| Go Wireless Cincinnati LLC | $ 4,209.22 | 2021/1 |
| Go Wireless Cincinnati LLC | $ 5,086.31 | 2020/4 |
| Go Wireless Cincinnati LLC | $ 4,162.47 | 2020/3 |
| Go Wireless Cincinnati LLC | $ 3,970.67 | 2020/2 |
| Go Wireless Cincinnati LLC | $ 3,636.94 | 2020/1 |

100.    I learned that, in addition to applying for and receiving Pandemic Unemployment Assistance in Ohio, HARRIS applied for Pandemic Unemployment Assistance from the following states:[18]

//

---

[18] At this time, I know that the Ohio PUA application was granted, but I do not know whether any of the other state applications were granted. I am working with Ohio Department of Labor investigators to obtain those records.

| State where HARRIS filed a PUA application | Date HARRIS filed the PUA application | Primary Occupation Listed |
|---|---|---|
| Arizona | 06/27/2020 | Unknown - Pending Return |
| California | 09/13/2020 | Unknown – Pending Return |
| Indiana | 09/28/2020 | Ball Management Group d/b/a McDonald's (shift-leader) |
| Tennessee | 10/01/2020 | Unknown - Pending Return |
| Massachusetts | 10/01/2020 | Unknown - Pending Return |
| Ohio | 06/16/2020 | Food servers, non-restaurant |

101. Based on my review of PUA applications, I learned that HARRIS filed the PUA applications using the following identifying information, leading me to believe that HARRIS submitted these applications on her own behalf:

    a. Name: Dazzling Harris
    b. SSN: ███████
    c. Email: ████████████
    d. Phone: ███████
    e. Address: ████████████ and █████████

102. Further, I know that HARRIS made multiple false statements in her PUA applications. For example, in her PUA application to Indiana, HARRIS falsely claimed to have worked full-time at a McDonald's located at 3129 25th St., #374, Columbus, IN 47203, from January 16, 2019, through March 10, 2020. She also claimed to be currently in the state of Indiana at the time she submitted the application. I know HARRIS was not living and working in Indiana during this time because, among other reasons, HARRIS was on probation through

Ohio's Montgomery County Common Pleas Court through March 11, 2019.[19] I also know, from my review of Ohio BMV records, that HARRIS had Ohio driver's license photographs that were taken in April 2019 and August 2019. HARRIS was also arrested for vandalism in October 2019 in Montgomery County, Ohio, and was on probation in Montgomery County, Ohio, for that conviction through January 10, 2022.[20]

103. Moreover, HARRIS submitted information in her Ohio PUA application that directly contradicts her claims in the Indiana PUA application. In her Ohio PUA application, HARRIS said that she has not been employed in any state other than Ohio since October 1, 2018, and that she had not filed an unemployment claim in any state other than Ohio since February 2, 2020. As I described above, HARRIS claims to have worked in Indiana in 2019 and 2020, and filed for unemployment in five other states after February 2, 2020.

### b) ALLEN's PUA Scheme

104. Additionally, on January 13, 2023, the same agent with the U.S. Department of Labor in Columbus, Ohio, informed me that ALLEN received PUA from Ohio totaling $33,975 beginning June 15, 2020, and lasting through January 10, 2022. According to ALLEN's PUA application with Ohio, he was a contractor and couldn't work due to COVID-19; however,

---

[19] Montgomery County Common Pleas Court case number 2018 CR 01196/1. HARRIS was unsuccessfully discharged.

[20] Montgomery County Common Pleas Court case number 2019 CR 02829. HARRIS was unsuccessfully discharged.

ALLEN submitted no tax records to support this claim. ALLEN also failed to report his PPP loan as income, and instead continued to report no weekly earnings.

105. Additionally, I reviewed Ohio Wage and Earnings Statements for ALLEN from fiscal year 2020 through fiscal year 2022. I learned that during fiscal year[21] 2022 quarter 3,[22] ALLEN received a wage amount of $4,456.25 from Staffmark Investment LLC. Therefore, ALLEN claimed wages from Staffmark while simultaneously receiving PUA funds.

106. Finally, I learned that ALLEN also applied for PUA from three of the same states from which HARRIS sought PUA funds:[23]

| State where ALLEN filed a PUA application | Date ALLEN filed the PUA application | Primary Occupation Listed |
|---|---|---|
| Arizona | 06/30/2020 | Unknown – Pending Return |
| California | 08/01/2020 | Unknown – Pending Return |
| Ohio | 06/15/2020 | Janitors and Cleaners, Except Maids and Housekeeping Cleaners |

---

[21] The 2022 fiscal year was October 1, 2021 – September 31, 2022.

[22] The third quarter of fiscal year 2022 was April, May, and June 2022.

[23] At this time, I do not know whether any of these applications were granted. I am working with Ohio Department of Labor investigators to obtain those records.

107. Based on my review of ALLEN's PUA applications, I learned that ALLEN filed the PUA applications using the following identifying information, leading me to believe that ALLEN submitted these applications on his own behalf:

- Name: Clay Allen
- SSN:
- Emails: ; and
- Phone:
- Address:

108. ALLEN made several false statements in his PUA application for Ohio. For example, ALLEN claimed that he had not filed an unemployment claim in any state other than Ohio since February 2, 2020, when, as depicted in the chart above, he had in fact submitted applications to Arizona and California during that time.

109. According to Ohio JFS, ALLEN received weekly PUA payments from March 2, 2021, through September 4, 2021, totaling $33,975. During the entire time of receiving assistance, ALLEN was required to affirm weekly that he was unable to work due to COVID. ALLEN stated during each and every week that he received no income during the reporting

---

[24] These are the same email addresses ALLEN provided to Ohio JFS, which I discussed in a previous section above.

[25] This phone number was used to book multiple flights for ALLEN, as I described in detail in a previous section above.

[26] ALLEN received PPP Loan number      in the amount of $18,657 for a "sole proprietorship" registered to this address.

period. The report stated that ALLEN was receiving payments to Bank Account # ███████

Routing # ███████ for Day Air Credit Union. I know that ALLEN's statements were false

because on April 29, 2021, ALLEN received the PPP loan. ALLEN failed to report the PPP as

income as required, which allowed him to receive unemployment benefits while simultaneously

getting income.

> **viii.     The evidence suggests that ALLEN and HARRIS coordinated their pandemic fraud efforts.**

110.     ALLEN and HARRIS's pandemic-related financial assistance requests bear

striking similarities in both substance—seeking, for example, PUA from three of the same states,

and receiving approximately the same PPP loan amount—as well as the timing and processes

they followed. For instance, ALLEN and HARRIS both received PPP loan approval on April 5,

2021, and both began receiving PUA on June 15- June 16th, 2020. This suggests that ALLEN and

HARRIS, who were making frequent trips to California together during this time, were

coordinating, communicating, and/or conspiring to effect their pandemic-related schemes. Based

on  my training and experience, I believe HARRIS and ALLEN likely used at least part of these

fraudulently obtained funds to help finance their ongoing drug trafficking scheme, which

entailed frequent travel to California.

//

//

**I.    The evidence suggests that ALLEN and HARRIS used electronic devices to perpetuate their drug-trafficking and pandemic aid schemes; therefore, I believe that any electronic device found at the Premises is likely to contain evidence.**

111.    The evidence suggests that ALLEN and HARRIS used electronic devices in furtherance of their crimes. I believe that any electronic device recovered from the Premises likely contains records, communications, location information, and other evidence relevant to my investigation into ALLEN and HARRIS's drug trafficking and financial schemes, including their likely collusion, communication, and/or coordination regarding their pandemic-related financial assistance applications.

112.    I know, based on my training and experience, as well as the records I have reviewed thus far—including airline records and the contents of the Dazzling Yahoo Email Account—that ALLEN and HARRIS's drug-related travel was booked electronically (i.e., someone used a computer or cell phone to access the internet for purposes of making travel arrangements).

113.    I also know, based on my training and experience, that individuals who use email typically own, maintain, or possess an electronic device capable of accessing the internet, such as a computer or cell phone. I know that ALLEN, HARRIS, and/or their coconspirators used multiple email addresses in furtherance of drug-related travel. I also learned that ALLEN used

the following Google accounts for the purpose of obtaining pandemic unemployment from Ohio and/or California:[27]

| Email Account | Source | Date ALLEN provided the email account | Home Address | Phone Number |
|---|---|---|---|---|
| ███████████ | California PUA application | 08/01/2020 | ███████████ | 8483 Phone |
| ███████████ | OH PUA Summary report | 12/06/2020 | ███████████ | 8483 Phone |
| ███████████ | OH PUA Summary Report | 09/18/2020 | ███████████ | 8483 Phone |
| ███████████ | Ohio PUA application; OH PUA Summary Report | 06/15/2020 | ███████████ | 8483 Phone |

114.    I also learned that ALLEN provided a different email account,

, to OH JFS on November 23, 2022, for the purpose of obtaining non-pandemic related unemployment. In that same application, ALLEN listed the address ███████████

---

[27] ALLEN used a yahoo email address in his PUA application to Arizona.

██████████ and the 8483 Phone. Based on my training and experience, I know it is common for those engaged in fraudulent activity to use multiple email accounts.

115.    My investigation to date has revealed that ALLEN and HARRIS use email accounts to book travel related to their drug-trafficking, and that their drug trafficking was likely financed at least in part by fraudulently obtained pandemic aid. I believe that any electronic device found at the Premises likely has information relevant to my investigation because I know that, among other things, electronic devices often have the ability to provide location information that could help identify sources of supply of drugs and/or additional DTO coconspirators, as well as the locations of individuals at the time criminal activity occurred (i.e., ALLEN and HARRIS's physical locations when they submitted PUA applications to various states). Information contained on electronic devices found at the Premises is likely to reveal the DTO's patterns of activity and methods of operation, such as records regarding travel for the purpose of drug trafficking; evidence of drug proceeds and the transfer of those proceeds; communications amongst other members of the DTO; photos, videos, and/or documents pertaining to drug trafficking; and locations of sources of supply and the identities of coconspirators.

116.    I believe that any electronic device found at the Premises will also contain evidence related to financial crimes. I know, based on when ALLEN provided his email accounts in connection with pandemic aid and unemployment applications, that his use of these accounts overlapped with multiple instances of pandemic-related fraud, suggesting that ALLEN possesses an electronic device capable of accessing the internet.

60

117.    I know that individuals who completed pandemic-related financial assistance applications did so online; therefore, any electronic devices at the Premises may have been used to complete those applications, or draft or store documents and files used in furtherance of those applications. I also know that individuals were required to electronically submit supporting documentation for pandemic assistance; those supporting documents, in addition to the application itself, may be stored on any electronic devices found at the Premises.

118.    Finally, I know that individuals who maintain a legitimate, operational business—as both ALLEN and HARRIS claimed to have done in order to receive their respective $18,000+ PPP loans—keep records pertinent to their business on their electronic devices. I believe that ALLEN and HARRIS may keep stored on their electronic devices records related to the incorporation of their businesses. I also believe that any electronic device found at the Premises will contain evidence that ALLEN and HARRIS were *not* legitimate business owners entitled to the PPP loans they received. For example, I believe that records showing how ALLEN and HARRIS used the PPP funds—including that the funds were not used for payroll or other legitimate business expenses—will be contained in electronic format and likely stored on electronic devices in their possession.

**J.  I believe that evidence relevant to my investigation is located at 4074 Middlehurst Lane, Dayton, Ohio 45406.**

119.    Based on record requests from Duke Energy, I learned that HARRIS began paying for utilities at 4074 Middlehurst Lane, Dayton, Ohio 45406, on or about December 21,

2022. According to HARRIS's Duke Energy profile information—which contains a known phone number and email account for HARRIS, along with her social security number—HARRIS reported that she is currently unemployed with a monthly household income of $691.

120.    On February 6, 2023, several investigators and I conducted physical surveillance at ████████████ which, as I describe in more detail above and below, is an address closely associated with ALLEN. On that afternoon, agents saw near ██████████████ a maroon Astro van previously associated with ALLEN.[28] Investigators followed the Astro van to Domino's Pizza at 1800 N. Main St., Dayton, Ohio, and observed a skinny black female exit Domino's and enter the Astro van. The skinny black female then went to a nearby residence and picked up several minor children before arriving at 4074 Middlehurst Lane, Dayton, Ohio, where she parked the Astro van. I observed several children and the same skinny black female enter the 4074 Middlehurst Lane residence. The skinny black female's appearance is consistent with that of HARRIS, who has minor children.

121.    On February 7, 2023, beginning at approximately 6:00 a.m., several investigators and I physically surveilled 4074 Middlehurst Lane, Dayton, Ohio 45406. Investigators observed ALLEN's known vehicle, a maroon Astro van, parked in the driveway. Investigators also saw a

---

[28] This is the same Astro van agents observed in relation to the 2021 drug package investigation, described in detail above.

second vehicle, a black SUV with Ohio license plate JXN7076 (the "black SUV"), parked in the driveway. The black SUV was registered to J.M.S.[29]

122.    At approximately 6:40 a.m., I observed ALLEN exit 4074 Middlehurst Lane, enter the black SUV, and depart the area. I also observed several minors with backpacks and a skinny adult black female—the same skinny black woman I observed the previous day, whom I believe to be HARRIS—exit 4074 Middlehurst Lane, enter the Astro van, and depart the area.

123.    I know that ALLEN and HARRIS are in a long-term romantic relationship. According to HARRIS's letter to the Court filed on January 9, 2023, which I described in a previous section above, HARRIS reported that she and ALLEN are "soul mates" [sic] and that they began dating approximately four years ago. HARRIS mentions having children in her letter, consistent with my observations the afternoon of February 6, 2023, and the morning of February 7, 2023. HARRIS's letter was dated December 28, 2022, and signed by HARRIS. Based on the similarity of the handwriting, I believe that HARRIS also filled out the letter's return address, which she listed as ████████████████████ I know that ALLEN and HARRIS previously lived together at this address. Based on my observations and my knowledge of the investigation as a whole, including the long-term romantic relationship between HARRIS and ALLEN, I believe that HARRIS resides at 4074 Middlehurst Lane and that ALLEN likely stays

---

[29] I am using J.M.S.'s initials to protect his privacy as he is not the subject of my investigation. I know J.M.S.'s full name.

overnight with her frequently and keeps belongings there. Based on my review of law enforcement databases and public records searches, I have no information suggesting that HARRIS lives elsewhere.

124.    I believe that evidence relevant to my drug trafficking and pandemic fraud investigation will be found at 4074 Middlehurst Lane, Dayton, Ohio 45406. I believe that HARRIS and ALLEN conspired to traffic large quantities of drugs to the Dayton, Ohio area, using fraudulently obtained pandemic funds to finance their scheme. I know, based on my training and experience, that people generally keep their cell phones, computers, bank records, financial statements, loan applications, employment records, paystubs, travel documents, and other files with personally identifying information inside their homes. Therefore, I believe that these documents are present at 4074 Middlehurst Lane. Other evidence of fraud and drug trafficking—such as luxury goods purchased with illegitimately obtained funds—will likely be present at 4074 Middlehurst Lane, where HARRIS and ALLEN can use them. I know, based on my training and experience, that drug traffickers frequently keep large quantities of cash in their homes, since drug trafficking is a cash-based business; therefore, I believe 4074 Middlehurst Lane may contain significant quantities of cash.

### K.  I believe that evidence relevant to my investigation is located at 3316 ███ ███

125.    As I described in detail above, I know that ███████████ is associated with drug trafficking and has been the focus of multiple DEA investigations over the years. For

example, I observed in a DEA case file that in approximately May of 2002, a DEA confidential

source purchased approximately a quarter ounce of heroin from ALLEN from the residence of

███████████████████████ The narcotics transaction took place in a bedroom belonging

to ALLEN, in which the CS stated that s/he observed scales, a plate with gel caps, an open box

with a new Glock handgun, and approximately $7,000 cash laying in seven different stacks.

126.     As I described in detail above, I observed ALLEN visiting ████████████

multiple times a week while conducting physical surveillance from approximately December 3,

2021, to May 3, 2022. I observed that ALLEN frequently left his home located at ████████

████████ and then proceeded to ███████████████████ a private residence

occupied by ████████ ALLEN's sister.[30] On many occasions I observed ALLEN spend the

daytime hours (roughly 10 a.m. to 5 p.m.) at █████████████████. While ALLEN

was spending the day at █████████████ investigators observed several other individuals

arrive at the residence, stay a short period, and then leave. Investigators identified the individuals

who briefly visited ████████████ and know that they have a narcotics criminal history.

Based on my training and experience, I know that this pattern of traffic to and from a residence is

---

[30] I believe this is ████████ residence based on Ohio BMV records. On February 6, 2023, investigators saw a car previously registered to her—expired plate GPL-8532—in the driveway. On that same day, investigators also saw a car bearing license plate JBR7756, which is registered to █████████ a known relative of ████ ████

consistent with drug trafficking. I believe that the individuals inside ▮▮▮▮▮▮▮▮ were

selling drugs.

127.    On or about February 7, 2023, as described above, I conducted physical

surveillance at 4074 Middlehurst Lane. Early in the morning, I observed ALLEN depart 4074

Middlehurst Lane and drive the black SUV—which was not registered to him—to ▮▮▮▮▮▮

▮▮▮, where he then went inside.  Based on my training and experience, I know it is common for

drug traffickers to use vehicles not registered to them in order to evade detection by law

enforcement.

128.    That same morning, while I was surveilling ALLEN at ▮▮▮▮▮▮▮▮▮ I

observed ALLEN step outside the residence and look around the neighborhood from the

property's curtilage. ALLEN looked particularly intently at my car (which is a government

vehicle that likely stood out amongst the other vehicles in the area). I saw ALLEN focus on my

car multiple times while he looked around the area before returning inside the house. Shortly

after ALLEN looked around, a woman I believe was ▮▮▮▮▮▮▮ came outside and engaged in

the same behavior. Based on my training and experience, I believe that ALLEN and ▮▮▮▮

▮▮▮ were likely engaged in countersurveillance (that is, attempting to see if law enforcement is

present at an area where illegal activity is taking place). I was able to video record ALLEN's

countersurveillance, a screenshot of which appears below:

66



129.    I know, based on my training and experience, and as I discuss in further detail below, that drug traffickers frequently use residences owned or primarily occupied by others to store their drug trafficking materials (controlled substances, firearms, and other drug trafficking paraphernalia).

130.    As part of this investigation, on January 11, 2022, I, along with other law enforcement, conducted a trash pull/survey of the trash left in the trash can outside of ███ ███████ and acquired several trash bags. Investigators observed a large amount of discarded consumables in the trash. One such item that I observed was a padded envelope

67

addressed to ██████████████ at ████████████ ████████████ I conducted a law

enforcement indices check of ████████████ and observed historical police reports in

which two different former DEA confidential sources identified ██████████ aka "████████

████████," as a heroin trafficker in Dayton, Ohio. ████████ is a familial relation of ALLEN.[31]

Further, I conducted a review of historical DEA wire intercept cases and learned that in 1999

████████████ was captured speaking with a main T-III target discussing the purchase of

one kilogram of cocaine for $24,000.

131.    I conducted a historical search of criminal activities that took place on the same

block as ████████████ I learned that, on February 23, 2021, ████████████[32] was

arrested for possessing more than five pounds of methamphetamine near ████████████

U.S.P.S and Montgomery County R.A.N.G.E task force conducted a controlled delivery of

intercepted methamphetamine to an address one street away from ████████ Investigators

observed ████████ retrieve the package and take it to an abandoned property located at ████

---

[31] I reviewed an obituary published in the Dayton Daily News in 2014 that indicated ALLEN is related to
████████

[32] In 1996, ████████ was under indictment in the Southern District of Ohio as part of the ████████ DTO.

██████████ ., which is directly across the street from ██████████ I believe that the ultimate destination of this package of methamphetamine was in fact ██████████

132. My review of DEA files revealed that ██████ is a criminal associate of ALLEN and had been observed at the ██████ address during surveillance conducted on January 12, 2022. During this surveillance, law enforcement observed ██████ leaving ██ ██████ before the Dayton Police Department traffic-stopped him. The DPD officers found that ██████ possessed approximately $5,000. I know, based on my training and experience, that drug trafficking is a cash-based business, and that carrying this amount of cash is not uncommon for drug traffickers. During this same traffic stop, ██████ said his phone number was ██████. I received toll records via administrative subpoena and learned that the 1441 number was in contact with other identified narcotics traffickers in the Dayton, Ohio area. My belief that ██████ $5000 is related to the ALLEN DTO is bolstered by the fact that flight records for ALLEN, depicted in a chart above, show that ALLEN flew to and from Los Angeles, California, on suspected drug trips shortly before ██████ traffic stop, as well as after the traffic stop.

133. Additionally, I located more DEA reports that reference ██████████ as being involved in narcotics trafficking. Based on all these foregoing reasons, I believe that ██

███████████ is used by the ALLEN DTO in furtherance of drug trafficking and has been for years.

134. Additionally, I believe that evidence of ALLEN's pandemic-related fraud may be located at ███████████ During my investigation I have learned that, in addition to ALLEN and HARRIS's PPP and PUA fraud, other ALLEN family members have likewise applied for PPP and PUA assistance that may be fraudulent and which occurred at or around the same time as ALLEN and HARRIS's fraudulent activity, suggesting that they may have conspired together.

135. I also learned that ███████████ is associated with at least three companies registered to an Allen family member, as indicated in the table below:

| Company | Date Incorporated | Registered Owner | Business Address |
|---|---|---|---|
| Queen Shoe Fetish | 11/13/2019 | ███████████ | ███████████ |
| Infinite Investment LLC | 4/23/2020 | | |
| Thirty3sixteen[34] Logistics LLC | 06/25/2021 | | |

136. During my surveillance of ███████████ on February 6, 2023, and February 7, 2023, I did not see any indications that any of the above-listed businesses are or were operating from this location (e.g., I did not see any business signs or company vehicles). I

70

performed an internet search and did not find any information about these businesses (or any business) operating at this address.

137. Based on my training and experience, I know that having multiple recently incorporated, unrelated businesses registered to the same business address, with each of those businesses then applying for pandemic-related loans, is highly indicative of fraud.

138. I believe that a lack of indicia of legitimate businesses operating out of █████ ██████████—e.g., a lack of business computers, business cards, business files, receipts for goods and services provided, business tax documents, and/or a lack of goods to be sold—would constitute evidence that these pandemic assistance applications were false. I know that each of the individuals who applied for loans listing ████████████ as the business's address or as the business's name has a connection with ███████████.

139. Furthermore, I believe that evidence of fraud—such as electronic devices containing records and communications about the scheme, bank records, and/or luxury goods purchased with illegitimately obtained funds—will be at ████████████ I also believe that evidence of others involved in the ALLEN DTO will be at ████████████ because it has been owned and occupied by a member of ALLEN's family since at least 2002, and because multiple individuals associated with ALLEN have connections to the address and drug trafficking histories. I believe that the ALLEN DTO is financing drug trafficking using

71

fraudulently obtained funds, and evidence of those funds and their use is therefore relevant to my drug trafficking investigation.

## TECHNICAL TERMS

140.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international

72

borders, even when the devices communicating with each other are in the same state.

   c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

141.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

142.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

73

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

74

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

143.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the

sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity

76

associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to

destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

78

144.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

145.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

146.     Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## BACKGROUND ON DRUG TRAFFICKERS

147.     Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following:

a)     Drug dealers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement, and it is common to find photos or other records relating to these items on any electronic devices, email accounts, and/or iCloud accounts used by the drug dealer;

b)     It is also common to find on drug dealers' electronic devices, email accounts, and/or iCloud accounts, as well as at physical locations such as drug dealers' residences, stash houses, and/or vehicles, evidence relating to the following common practices of drug dealers:

i.     Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii.    Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii.   Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv.   Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v.    Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the

82

proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi.    Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii.    Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.

They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii. Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds.  These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business.  Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

ix. Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x. Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds.  Documents relating to such travel,

84

such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.    Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiii.    During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xiv.    Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles.

xv.    I know that drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities. I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without

85

exposing themselves to the subject they are following.  This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

## **CONCLUSION**

148.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

//

//

//

//

//

//

//

//

//

//

86

## REQUEST FOR SEALING

149.     It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the application

and search warrant.  I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation into the criminal organizations

as not all of the targets of this investigation will be searched at this time.  Based upon my

training and experience, I have learned that online criminals actively search for criminal

affidavits and search warrants via the Internet, and disseminate them to other online criminals as

they deem appropriate, i.e., post them publicly online through the carding forums.  Premature

disclosure of the contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

DAVID ASHLEY   Digitally signed by DAVID ASHLEY
Date: 2023.02.08 22:23:41 -05'00'

David Ashley
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
on February  9  , 2023:

Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

*Property to be searched*

The property to be searched is **4074 Middlehurst Lane, Dayton, Ohio 45406,** pictured below, and further described as a single-story single-family residence with colored siding. The front door has a screen door with a porch light to the left of this door and a mailbox attached to the house on the right of the door. When viewing the front of the house, there is a recessed pedestrian door to the left which also has a screen door, and two windows to the right of the front door. The property to be searched includes any vehicles on the curtilage of 4074 Middlehurst Lane, Dayton, Ohio 45406, including, but not limited to, a maroon Astro van (pictured below in the driveway).



## ATTACHMENT B

*Property to be seized*

1.      All records and items relating to violations of 21 U.S.C. §§ 841(a) and 846 (possession with intent to distribute a controlled substance and conspiracy to do so); 21 U.S.C. § 843 (use of a communication facility to commit a felony drug offense); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); 18 U.S.C. § 1014 (False Statement in Loan and Credit Applications); 15 U.S.C. § 645(a) (False Representations to the Small Business Administration); and/or 18 U.S.C. § 1040 (Fraud in Connection with Emergency), those violations involving Clay ALLEN, Dazzling HARRIS, and/or other unknown subjects, and occurring on or after January 1, 2019, through June 30, 2022:

   a.   Any cell phone, computer, tablet, and/or other electronic device capable of accessing the internet, communicating with other electronic devices, and/or storing electronic information;

   b.   The sale, possession, and/or distribution of methamphetamine, fentanyl, and/or other controlled substances;

   c.   Drug proceeds and the location and/or use or transfer of such proceeds;

   d.   Communications between Dazzling Harris, Clay Allen, and/or other co-conspirators;

e.   List of customers and related identifying information;

f.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

g.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

h.   Firearms and/or ammunition;

i.   Any shipping supplies, including, but not limited to, cardboard boxes, shipping labels, packaging materials, and/or postage labels;

j.   All bank records, checks, credit card bills, account information, and other financial records;

k.   Any records and information pertaining to the means and source of payment for services and items (including any credit card or bank account number or digital money transfer account information);

l.   Any records and information pertaining to travel, including but not limited to records of lodging (such as hotels), air travel, vehicle rentals, and expenses incurred during the time of travel;

m.   Any records and information pertaining to loan applications, including but not limited to pandemic-related loans;

2

n.  Any records and information pertaining to unemployment assistance applications, including but not limited to pandemic-related unemployment assistance;

o.  Any records and information pertaining to income and/or employment;

p.  Any records and information pertaining to the operation of a business, including, but not limited to, business letterhead, business files, business cards, payroll, lists of employees, employee/personnel files, facsimile machines, copiers, business computers, and/or tax documents; and

q.  Records and information relating to the identity or location of coconspirators.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

3

of the presence or absence of security software designed to detect malicious

software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

4

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

3.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

5

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.